UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

United States of America        :
                                :
v.                              :        Case No. 3:05cr268 (JBA)
                                :
Chance M. Vought and            :
John M. Lucarelli               :


**RULING ON DEFENDANTS' PENDING MOTIONS [DOCS. ## 30, 33-35, 37-38]**

On October 14, 2005, a federal grand jury returned a twelve-count indictment charging defendant Chance M. Vought with conspiracy to commit mail, wire, and securities fraud in violation of 18 U.S.C. § 371 (count one), mail fraud in violation of 18 U.S.C. § 1341 (count four), wire fraud in violation of 18 U.S.C. § 1343 (counts five and six), and securities fraud in violation of 18 U.S.C. § 1348 (count twelve).  The same indictment charged defendant John M. Lucarelli with conspiracy to commit mail, wire, and securities fraud (count one), mail fraud (counts two through four), and securities fraud (counts seven through twelve).  The indictment alleges a scheme in which defendants and others conspired to illegally obtain shares of New Alliance Bancshares, Inc. ("NAB") in connection with a transaction in which New Haven Savings Bank ("NHSB" or "the Bank") converted from a Connecticut-chartered mutual savings bank to a Connecticut-chartered capital stock savings bank, and became a wholly-owned subsidiary of NAB.  Indictment [Doc. # 1].

1

The scheme was purportedly perpetrated "by causing eligible [NHSB] account holders to make false representations on stock order forms submitted to NHSB and thereby acquire [s]hares [of NAB] to transfer to defendants and their co-conspirators, who then would and did sell the [s]hares at a profit."  Id. ¶ 15.

Both defendants now move to dismiss the indictment and for a bill of particulars.  See [Docs. ## 30, 34, 35, 37].  Defendant Vought also moves to exclude all Fed. R. Evid. 404(b) evidence of which he claims the Government has failed to provide proper notice [Doc. # 33] and defendant Lucarelli also moves pursuant to Fed. R. Crim. P. 17(c) for the issuance of a subpoena for records of the former NHSB [Doc. # 38].[1]  Oral argument was held on defendants' motions on May 15, 2006.  For the reasons that follow the motions to dismiss and for a bill of particulars will be denied.  Defendant Vought's Motion to Exclude will be granted in part and denied in part, and defendant Lucarelli's Motion for Issuance of a Subpoena will be granted.

## I.   FACTUAL BACKGROUND

The Indictment alleges that "[b]eginning in or about January 2004 and continuing until in or about September 2004, . . . the defendants and others known and unknown to the Grand Jury, did knowingly combine, conspire, confederate, and agree together and

---

[1] Defendants' Motions to Transfer [Docs. ## 32, 36] were denied on May 15, 2006 at oral argument for the reasons set out on the record.

with each other," "to illegally obtain Shares of [NAB] Stock by causing eligible accounts holders to make false representations on stock order forms submitted to the NHSB and thereby acquire Shares to transfer to the defendants and their co-conspirators, who then would and did sell the shares at a profit."  Indictment ¶¶ 14-15.

The subject of the alleged conspiracy was the conversion of NHSB from a Connecticut-chartered mutual savings bank to a Connecticut-chartered capital stock savings bank and wholly-owned subsidiary of NAB.  Id. ¶ 7.  Under the terms of the initial public offering, "the shares of common stock of [NAB] were offered for sale at a price of $10.00 per share in the subscription offering, pursuant to which rights to subscribe for the Shares were granted to potential purchasers in five (5) tiers, in descending order of priority from tier one to tier five.  Tier one, members of which had first priority, was comprised of 'eligible account holders,' defined as each holder of deposit accounts with aggregate balances of $50.00 or more on the 'record date' or 'cut-off date' of June 30, 2002."  Id. ¶ 10. Tier one members had the opportunity to purchase up to 70,000 shares; if tier-one depositors collectively requested more than the available stock, each would be allocated 100 shares and the remaining shares would be distributed pro rata based on the value of each tier one member's account.

The Indictment charges that defendants conspired to and did contact eligible account holders (i.e. tier one account holders) for the purpose of "entering into an arrangement for using their subscription rights to purchase the Stock, including representing to them, among other things, that: (a) a member of the conspiracy would provide the money to buy the Stock; (b) the arrangement would be such that the account holders would not lose money on the transaction; and (c) the account holders would receive a portion of the profits from the transaction." Id. ¶ 19.  As a result, the Indictment alleges, these account holders signed stock order forms containing "materially false and fraudulent pretenses and representations including falsely certifying as follows: 'I am purchasing solely for my own account, and there is no agreement or understanding regarding the sale or transfer of the shares or the right to subscribe for the shares.'" Id. ¶ 25. On the basis of these false and fraudulent order forms, the account holders purchased stock (financed by the conspiracy), endorsed the stock certificates over to the conspiracy, and defendants ultimately sold the stock for a profit.

The Indictment also provides that the IPO was "oversubscribed in tier one and accordingly, Shares were not sold beyond the first-tier.  As a result of the over subscription, Shares were allocated in accordance with the plan of conversion and in accordance with a formula, described in the prospectus,

4

that based allocations upon the amount of money on deposit in an eligible account holder's account and the proportion that the deposits bore to the total amount of deposits of all eligible account holders whose subscriptions remained unfilled." Id. ¶ 11.  According to the Indictment, "[a]s a result, certain first-tier account holders did not receive the full amount of Stock that they had requested." Id.

As noted above, the Indictment charges conspiracy, mail fraud, wire fraud, and securities fraud.

## II.  MOTIONS TO DISMISS [DOCS. ## 30, 35]

Upon a motion to dismiss, the allegations in the indictment must be accepted as true. See United States v. Alfonso, 143 F.3d 772, 776-77 (2d Cir. 1998).  "The indictment . . . shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).  "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." Hamling v. United States, 418 U.S. 87, 117 (1974) (citations omitted); accord Alfonso, 143 F.3d at 776.  "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and

expressly . . . set forth all the elements necessary to
constitute the offence intended to be punished."  Hamling, 418
U.S. at 177 (internal quotations omitted).  The indictment "must
descend to particulars," however, if "the definition of an
offence . . . includes generic terms."  United States v.
Cruikshank, 92 U.S. 542, 558 (1875) (internal citation omitted);
accord United States v. Pirro, 212 F.3d 86, 92-93 (2d Cir. 2000).

In the absence of a full proffer of the Government's
evidence, "the sufficiency of the evidence is not appropriately
addressed on a pretrial motion to dismiss an indictment."
Alfonso, 143 F.3d at 776-77 (reversing dismissal of an indictment
when the district court "looked beyond the face of the indictment
and drew inferences as to the proof that would be introduced by
the government at trial" to satisfy an element of the charge);
accord Costello v. United States, 350 U.S. 359, 363 (1956) (If
"valid on its face," a grand jury indictment "is enough to call
for trial of the charge on the merits.") (citations and footnote
omitted).

**A.   Property Rights**

The Depositors

18 U.S.C. § 1341 provides, in relevant part:

Whoever, having devised or intending to devise any
scheme or artifice to defraud, or for obtaining money
or property by means of false or fraudulent pretenses,
representations, or promises, . . . for the purpose of
executing such scheme or artifice or attempting so to
do, [uses the mails or causes them to be used], shall

be fined under this title or imprisoned not more than
20 years, or both.

"To procure a conviction for mail fraud, the government must
prove three elements: (1) a scheme to defraud victims of (2)
money or property, through the (3) use of the mails." United
States v. Walker, 191 F.3d 326, 334 (2d Cir. 1999).[2]  In McNally
v. United States, 483 U.S. 350 (1987), the Supreme Court held
that § 1341 is "limited in scope to the protection of property
rights." Id. at 360.  McNally recognized that the phrase "any
scheme or artifice to defraud" "is to be interpreted broadly
insofar as property rights are concerned," id. at 356, but
ultimately rejected the argument that § 1341 could protect an
intangible right to honest and impartial government services, a
holding that was subsequently overruled by the enactment of 18

_____

[2] As recognized in United States v. Thomas, 377 F.3d 232,
242 n.5 (2d Cir. 2004), "the mail fraud statute [§ 1341] and the
wire fraud statute [§ 1343] [both] criminalize a 'scheme to
defraud,'" and "[b]ecause . . . these statutes use the same
relevant language, they are analyzed in the same way."  Although
not explicitly referenced in Thomas, the securities fraud
statute, 18 U.S.C. § 1348 also uses similar language although, as
the Government notes, the securities fraud statute tracks the
bank fraud statute (18 U.S.C. § 1344) and sets forth two theories
of liability: (1) engaging in a scheme to defraud in connection
with a security; and (2) engaging in a scheme "to obtain, by
means of false or fraudulent pretenses, representations, or
promises, any money or property" in connection with a security.
The Government contends that "[i]t may very well be the case
that, in connection with the second theory of liability, the
Government need not prove that the scheme placed any person at
risk of loss."  Gov't Opp. at 12 n.2.  Nevertheless, for the
purposes of defendants' motions to dismiss, the Government
"assume[s] arguendo that risk of loss applies to both theories of
liability."  Id.

U.S.C. § 1346 which explicitly provides that mail fraud encompasses "scheme[s] . . . to deprive another of the intangible right to honest services." See United States v. Bortnovsky, 879 F.2d 30, 39 (2d Cir. 1989) (recognizing overruling of McNally in this regard). As acknowledged subsequently by the Supreme Court in Cleveland v. United States, 531 U.S. 12 (2000), McNally recognized "that 'the original impetus behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property.'" Id. at 18-19 (citing McNally, 483 U.S. at 356).

Defendants argue that the alleged scheme does not constitute a scheme to defraud the depositors of a property right under the statutes because the depositors had no property, or right to property, but only had a right to request stock, and because the Bank's acceptance of any such request was conditional on a number of factors (such as the total number of shares requested and the amount of money a requesting depositor had in his or her account), a depositor's right to shares was only "a possibility." Defendants contend that to qualify under the statutes, "the threatened property must actually have belonged to the victim unconditionally at the time the scheme was perpetrated." Vought Mem. [Doc. # 31] at 7-9 (citing cases); see also Vought Reply [Doc. # 52] at 15-17 (an inalienable speculative or conditional interest, such as the possibility of purchasing stock, does not

qualify as "property in the hands of the victim").

The Government responds that the opportunity to purchase securities at a discounted price is "something of value," which qualifies as property under the fraud statutes.  See Gov't Opp. [Doc. # 42] at 17 (citing cases).  The Government notes that the Indictment sets forth that the IPO was oversubscribed, meaning that eligible account holders sought to purchase more shares than were available, and had the defendants not executed their scheme, the stock defendants obtained would have been available to depositors who wanted to, and were entitled to, purchase those shares.  The Government also claims that the purpose of the defendants' "vetting" process was to identify straw purchasers who had sufficiently large deposits to allow defendants to purchase significant quantities of stock.  Id. at 17-18 (citing Indictment ¶ 20).

In Carpenter v. United States, 484 U.S. 19 (1987), the Supreme Court stated that the words "to defraud . . . have the common understanding of wronging one in his property rights by dishonest methods or schemes, and usually signifying deprivation of something of value by trick, deceit, chicane, or overreaching."  Id. at 27 (internal quotation omitted). Carpenter ultimately held that confidential business information of the Wall Street Journal constituted "property" under the mail fraud statute, concluding that "its intangible nature [did] not

9

make it any less 'property' protected by the mail and wire fraud statutes. . . . [I]t is sufficient that the Journal has been deprived of its right to exclusive use of the information, for exclusivity is an important aspect of confidential business information and most private property for that matter." Id. at 26-27.  By contrast, in Cleveland, where defendant had made false statements in his application to the State of Louisiana for a license to operate video poker machines, the Supreme Court concluded that "such a license is not 'property' in the government regulator's hands," where "[t]he State receives the lion's share of its expected revenue not while the licenses remain in its own hands, but only after they have been issued to licensees."  531 U.S. at 20-22.  The Court rejected a patent analogy proposed by the Government, observing "[i]nstead of a patent holder's interest in an unlicensed patent, the better analogy is to the Federal Government's interest in an unissued patent.  That interest, like the State's interest in licensing video poker operations, surely implicates the Government's role as sovereign, not as property holder." Id. at 24.

The depositors' interest here – an opportunity to purchase shares at a discounted price pursuant to a specified allocation system – seems more akin to a patent holder's interest in an unlicensed patent than the Government's interest in an unissued patent.  This is because, as the Seventh Circuit explained in

United States v. Ashman, 979 F.2d 469 (7th Cir. 1992), "shifting or altering of economic risk or opportunity to affect a person's financial position adversely deprives that person of money or property." Id. at 478.  In Ashman, defendants were brokers and traders who fraudulently manipulated customer orders to buy and sell soybean futures "[b]y picking customer prices and opposing traders, [thus] remov[ing] their customers from the . . . competitive marketplace and forc[ing] the customers to accept the results they selected, guaranteeing profits to the local [traders] and denying the customer the opportunity to obtain a better price." Id. at 477-78.  Ashman rejected "the defendants' assertion that the . . . scheme did not rob any customer of a tangible interest," noting that "even though the customers may not be entitled to any specific price, deliberate refusal to pursue the best price the broker could obtain can constitute a scheme to defraud." Id. at 478.[3]

---

[3] Defendants' attempts to distinguish Ashman are unpersuasive.  Defendants recognize that Ashman held that victims were harmed financially because they lost the opportunity to obtain the best price for their futures orders, but contend that "there was no question that the object of the fraud there was actual property – namely, soybean futures that the customers actually owned and intended to sell, or money with which they wanted to purchase futures – and they were defrauded out of that property.  Here, on the other hand, no depositors owned or were entitled to anything." Vought Reply. at 17-18.  To the contrary, just as the scheme in Ashman deprived customers of the opportunity to shop for a better price in an open market, by corrupting the execution of the Bank's share allocation system, defendants's alleged scheme deprived bank depositors of their opportunity to purchase a certain amount of shares to be

Somewhat similarly, in United States v. Paccione, 949 F.2d 1183 (2d Cir. 1991), the Second Circuit affirmed defendants' mail fraud convictions for defrauding New York City of several million dollars in lost dumping fees.  In Paccione, defendants began illegally operating their own landfill which thus reduced defendants' companies' own dumping costs and also enticed away other dumpers from New York City landfills (the "principal" City landfill being the Fresh Kills landfill on Staten Island).  See 949 F.2d at 1187.  The Second Circuit rejected defendants' argument that "the City failed to prove any cognizable loss of dumping fees because defendants had no obligation to dump at Fresh Kills," reasoning that "[d]efendants and other companies that used [defendant's landfill] had previously dumped at Fresh Kills, and the government presented evidence showing that City revenues from that facility declined precipitously during the time of operation of the [defendants'] dump."  Id.  Compare United States v. Henry, 29 F.3d 112, 114-15 (2d Cir. 1994) (affirming district court's dismissal of wire and mail fraud charges on the basis that competing banks' interests in a fair bidding opportunity to serve as depositories of the Toll Bridge Commission's revenues did not constitute property rights under the fraud statutes, reasoning that there was "no way of knowing to which, if any, of the bidding banks it would have gone.  Even

_____

determined by that system.

12

in a fair process, Bank A might still have won the depositors.
The issue, therefore, is whether the competing bank's interest in
having a fair opportunity to bid for something that would become
their property if and when it were received is in itself
property.  We conclude that it is not"); United States v. Adler,
186 F.3d 574, 575 (4th Cir. 1999) (affirming dismissal of wire
fraud conviction where defendant had been charged with failing to
pay a subcontractor the balance of the contract price upon
receiving settlement funds for breach of contract by a second
subcontractor, reasoning that whatever interest the subcontractor
had in the "particular settlement proceeds received [by
defendant]" did not constitute a property right sufficient for
fraud prosecution, finding that the subcontractor's "claim on
debt is distinct from a claim to particular funds to satisfy that
debt and [] the mere existence of the former does not give rise
to the latter").[4]

---

[4] Defendants cite several other cases in support of their
argument that to qualify under the statutes, the victim's right
to the property must be then-existing and unconditional, arguing
that at the time of the alleged scheme, the depositors only had a
possibility of obtaining stock, a right that was explicitly
inalienable.  However, these cases do not create a requirement
that the "thing of value" be alienable, nor do they stand for the
proposition that where a certain group of people are entitled to
purchase property in accordance with a predetermined system, a
scheme to corrupt that system does not deprive them of that
entitlement; rather they stand for the proposition that the
target of the allegedly fraudulent scheme must constitute
property "in the hands" (i.e., from the perspective) of the
victim.  See Pasquantino v. United States, 544 U.S. 349 (2005)
("Canada's right to uncollected excise taxes on the liquor

Applying the analyses from <u>Ashman</u> and <u>Paccione</u>, while the actual shares of sock were not yet owned by the depositors, the depositors had a right – pursuant to the Bank's predetermined share allocation formula – to obtain a certain number of those shares, which amount was, as alleged in the Indictment, reduced by defendants' scheme, thus representing a cognizable loss.

<u>The Bank</u>

The Government also advances the theory that the defendants sought to interfere with a property right of the bank, namely the bank's right to control its own assets.  Gov't Opp. at 12.  The Government contends that under Second Circuit law, "the right to

---

petitioners imported into Canada is 'property' in its hands. This right is an entitlement to collect money from petitioners, the possession of which is "something of value" to the Government of Canada. . . . Valuable entitlements like these are 'property' as that term is ordinarily employed."); <u>United States v. Pierce</u>, 224 F.3d 158 (2d Cir. 2000) (where the Government alleged a scheme "to defraud the Canadian government of . . . its right to obtain property, its right to be paid money," defendants' convictions would be reversed for lack of evidence "that Canada imposes duty on imported liquor in the first place," because without such evidence "the government [could not] prove a scheme to defraud the Canadian government because there is no evidence whatsoever of a property right – a right to revenue – of which the Canadian government could be defrauded"); <u>United States v. Novod</u>, 923 F.2d 970 (2d Cir. 1991) (permit issued to private person to operate dumping site did not constitute property in the hands of the state government); <u>United States v. Eckhardt</u>, 843 F.2d 989 (7th Cir. 1988) (charge that defendant interfered "with the IRS's proper ascertainment and collection of income taxes [but not] that he deprived the government of revenue" did not support indictment because "[t]he connection between the charged conduct and the loss of revenue . . . is too tenuous and speculative to constitute an actual deprivation of money or property").

control one's assets is protected as property under the fraud statutes." Id. (citing cases).  Defendants respond that the statutes "by their terms expressly limit the types of fraudulent schemes that are prohibited to those directed at obtaining 'money' or 'property,'" and that "these laws are not catch-all prohibitions on deceptions or false statements of every type." Vought Reply at 3.  Defendants thus claim that the Government's "novel argument that the Bank was deprived of the intangible 'right to control' which depositors would receive stock [f]ails as a matter of law" because "[i]n the absence of loss – or even the possibility of loss – the newly asserted right of the Bank to 'control its assets' is not a property right and thus it cannot form the basis for the mail, wire, and securities fraud charged in the Indictment." Id.

In United States v. Wallach, 935 F.2d 445 (2d Cir. 1991), the Second Circuit found that "[e]xamination of the case law exploring the 'right to control' reveals that application of the theory is predicated on a showing that some person or entity has been deprived of potentially valuable economic information. . . . Thus, the withholding or inaccurate reporting of information that could impact on economic decisions can provide the basis for a mail fraud prosecution." Id. at 462-63.  Accordingly, the alleged misrepresentations must be of "independent value" or "bear on the ultimate value of the transaction" to the Bank.  See

United States v. Mittelstaedt, 31 F.3d 1208, 1217 (2d Cir. 1994).

The Government's "right to control" theory in this case can best be analogized to United States v. Schwartz, 924 F.2d 410, 421 (2d Cir. 1991), in which the Second Circuit concluded that due to defendants' misrepresentations, the government contractor victim did not receive "all it bargained for," because it "insisted its product not be exported from the country illegally and defendants' conduct deprived [it] of the right to define the terms for the sale of its property in that way, and cost it, as well, good will because equipment Litton, a government contractor, sold was exported illegally."  The court found that Litton, the government contractor, "made explicit its requirement that the equipment not be exported without proper permits and expressly demanded assurances from [defendants] that the purchased devices would not be used to violate the arms export laws and regulations" and, as a Litton executive testified at trial, "if [defendants] had not been able to guarantee these conditions, Litton would not have sold its product to them."  Id. The Schwartz court thus distinguished other cases where the "false representations were collateral to the bargain and did not cause any discrepancy between benefits reasonably anticipated and actual benefits received [and] [t]hus, the deceit did not go to an essential element of the bargain."  Id. at 420.

As was the case in Schwartz, the Indictment here alleges

that the Bank expressly conditioned share purchases on the purchaser certifying: "I am purchasing solely for my own account, and there is no agreement or understanding regarding the sale or transfer of the shares or the right to subscribe for the shares." Indictment ¶ 25.  The Bank insisted that this certification be made pursuant to federal banking regulations.  See 12 C.F.R. §§ 563b.320, 536b.340.  Thus, like the misrepresentations made in Schwartz, defendants' alleged misrepresentations to the Bank went to an essential element of the bargain – that is, the assurance that depositors were purchasing shares on their own behalf and not pursuant to any agreement or understanding with a non-depositor.  See also United States v. Frank, 156 F.3d 332, 335-36 (2d Cir. 1997) (affirming convictions for conspiracy to commit mail fraud where municipalities contracted with defendants for waste disposal at least 106 miles from shore, pursuant to federal law, and defendants "routinely dumped sludge in waters short of the 106-mile site, and . . . nonetheless participated in a fraudulent scheme to bill the municipalities by mail as if all of the waste disposal had occurred at the 106-mile site" subjecting municipalities to potential fines and loss of environmental permits).

This case, like Schwartz, can thus be distinguished from cases cited by defendants, including United States v. Starr, 816 F.2d 94 (2d Cir. 1987), and United States v. Regent Office Supply

17

<u>Co.</u>, 421 F.2d 1174, 1179-82 (2d Cir. 1970), because in those cases the alleged victims were not deprived of any essential element of the bargain.  In <u>Starr</u>, defendants allegedly perpetrated a scheme in which they represented to their customers that money paid would be used for mailing their customers' business brochures, when in fact only a portion of the funds were used for postage, and the remainder was pocketed by the defendants.  <u>See</u> <u>id</u>. at 99.  The Second Circuit reversed defendants' convictions, noting "[m]isrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution.  Instead, the deceit must be coupled with a contemplated harm to the victim.  Moreover, the harm contemplated must affect the very nature of the bargain itself."  <u>Id</u>. at 98.  The evidence showed that the <u>Starr</u> defendants "did in fact mail their customers' brochures as promised and caused them to arrive at the correct destination.  The agreement for timely shipment and handling of bulk mail was the basis of the bargain between the Starrs and their customers," and thus the Second Circuit could not identify any harm defendants intended to inflict on their customers.  <u>Id</u>. at 99.  It held that "[t]he Starrs in no way misrepresented to their customers the nature or quality of the service they were providing.  Indeed, satisfied customers were a necessary ingredient in the successful operation of their business.  Therefore, because [their] customers received exactly

18

what they paid for, there was no discrepancy between benefits reasonably anticipated and actual benefits received.  An intent to defraud the lettershoppe customers was not demonstrated either directly or circumstantially."  Id.

In Regent Office Supply, the Second Circuit also reversed defendants' wire fraud convictions, finding that there was no showing that defendants' agents made any false representations in connection with sales of stationery supplies regarding the quality or price of the merchandise, noting "[defendants'] agents did not attempt to deceive their prospective customers with respect to the bargain they were offering; rather, they gave a false reason for being able to offer the bargain."  421 F.2d at 1179-82.

Accordingly, the Court concludes that, as it is alleged in the Indictment, defendants' fraudulent scheme went to an essential element of the bargain between the straw purchasers and the Bank regarding the sale of the Bank's stock sufficient to implicate money or property under the fraud statutes.[5]

---

[5] In his reply brief, defendant Lucarelli requests "[i]n view of the Government's recent identification of the NHSB as a victim . . . that the Court inspect the grand jury minutes in this case to determine whether the addition of the NHSB as a victim is supported by the grand jury testimony and instructions to the grand jury. . . . The grand jury record may reveal that the grand jurors were not even told that the Indictment would include a charge that the NHSB was a victim of fraud."  Lucarelli Reply at 5 n.3.  "Grand jury proceedings carry a 'presumption of regularity' [and] [a] review of grand jury minutes is rarely permitted without specific factual allegations of government

**B.    Intended Target of the Scheme**

Defendants next contend that the depositors-as-victims theory is not viable because in order for a fraud charge to be legally cognizable the entity allegedly deceived (the Bank) must be the same as the person or entity allegedly deprived of a property right (the depositors who received less stock than they sought).  See Vought Mem. at 10-11 ("Those victimized by a criminal scheme to defraud must themselves have been the actual or intended target of the fraud under each of the mail, wire, and securities fraud statutes.").  The Court does not agree that such a disconnect precludes a prosecution for mail, wire, or securities fraud under the Government's depositors-as-victims theory.

In McNally, the Supreme Court explained that "the words 'to defraud' commonly refer to wronging one in his property rights by dishonest methods or schemes, and usually signify the deprivation of something of value by trick, deceit, chicane or overreaching." 483 U.S. at 358 (internal quotation omitted).  The Supreme Court also stated that it "believe[d] that Congress' intent in passing the mail fraud statute was to prevent the use of the mails in

_____

misconduct."  United States v. Torres, 901 F.2d 205, 232-33 (2d Cir. 1990).  Defendant Lucarelli's speculation – in a footnote in his reply brief – that this theory may not have been presented to the grand jury, without any specific factual allegations to support his claim, does not meet this standard and thus the request will be denied.

furtherance of such schemes," noting, "[i]nsofar as the spare
legislative history reveals anything, it indicates that the
original impetus behind the mail fraud statute was to protect the
people from schemes to deprive them of their money or property."
Id. at 356, 358.  McNally does not identify any requirement, in
the legislative history or elsewhere, of a convergence between
the person or entity deceived, and the person or entity deprived.

Nevertheless, the Second Circuit in United States v. Evans,
844 F.2d 36 (2d Cir. 1988), considered the issue in dicta, noting
the McNally court "did not focus on whether the person deceived
also had to lose money or property," but stating "[n]onetheless,
this may be the correct view of the statute.  If a scheme to
defraud must involve the deceptive obtaining of property, the
conclusion seems logical that the deceived party must lose some
money or property."  Id. at 39.  The Evans court emphasized that
the Supreme Court found the intent of the mail fraud statute was
"to protect the people from schemes to defraud them of their
money or property," and defined "to defraud" as "to wronging one
in his property rights by dishonest methods or schemes."  Id.
(emphasis in original).  However, these quotations from McNally
by their words do not impose the convergence requirement
hypothesized by Evans.  See Corcoran v. Am. Plan Corp., 886 F.2d
16, 20 (2d Cir. 1989) (finding it unnecessary to decide "whether
the mail fraud statute requires that the party deceived also be

21

the party injured," noting that subsequent to <u>Evans</u>, "the Supreme Court decided <u>Schmuck v. United States</u>, . . . affirming the mail fraud convictions of a used car distributor who set back odometers to a lower mileage before selling cars to retailers. Presumably, both the retailers and their customers who ultimately bought the cars were deceived, while in at least some cases only the customers sustained economic injury.  The Court did not address the question whether the same party must be both deceived and injured to state a violation of section 1341"); <u>see</u> <u>also</u> <u>United States v. Christopher</u>, 142 F.3d 46, 54 (1st Cir. 1998) (declining to adopt a convergence theory on appeal of a wire fraud conviction, noting "[n]othing in the mail and wire fraud statutes requires that the party deprived of money or property be the same party who is actually deceived. . . . <u>McNally</u> itself says nothing about convergence.  We see no reason to read into the statutes an invariable requirement that the person deceived be the same person deprived of the money or property by fraud."). <u>But</u> <u>see</u> <u>United States v. Lew</u>, 875 F.2d 219, 221-22 (9th Cir. 1989) (inferring from <u>McNally</u> a requirement that "the intent must be to obtain money or property from the one who is deceived").[6]

_____

[6] Of the cases in this Circuit to have considered the Second Circuit's dicta in <u>Evans</u>, the closest cases are civil RICO cases, where proof of a predicate act under the fraud statutes is a necessary element, in the context of assessing whether a particular plaintiff has standing to assert a claim.  The Second Circuit in <u>United States v. Eisen</u>, 974 F.2d 246 (2d Cir. 1992), noted "[s]ome District Courts in this Circuit have concluded that

Rejection of a convergence requirement under the statutes is also consistent with the dicta in <u>Starr</u>, the case in which defendants' convictions were reversed for absence of evidence of intent to harm where their customers' brochures were sent in the manner promised.  In that case, Judge Newman noted in concurrence that "[t]he Government has simply indicted the defendants for

---

this Court's dicta in <u>Evans</u> stands only for the proposition that a civil RICO plaintiff must have been injured to have standing under section 1964."  <u>Id</u>. at 253 n.2 (citing cases).  For example, in <u>Trautz v. Weisman</u>, 819 F. Supp. 282 (2d Cir. 1993), the court rejected defendants' argument that "RICO requires a convergence or causal connection between the deceived and the injured."  <u>Id</u>. at 286.  <u>Trautz</u> noted that the Second Circuit did not decide this issue in <u>Evans</u>, explained that "[a]fter surveying the caselaw, it seems clear that the question of whether the mail and wire fraud statutes, and by extension RICO, require that the party deceived also be the party injured remains unsettled in this circuit.  In our research we have found no cases which hold that a convergence of the deceived and injured is required to demonstrate proximate causation for a RICO claim."  <u>Id</u>.  The court thus "decline[d] to read a convergence theory into the RICO statute."  <u>Id</u>.  <u>Accord</u> <u>Shaw v. Rolex Watch U.S.A., Inc.</u>, 726 F. Supp. 969, 973 (S.D.N.Y. 1989) (rejecting defendants' arguments in support of dismissal, holding "[a] plaintiff who is injured as a proximate result of fraud should be able to recover regardless of whether he or a third party is the one deceived," noting that in both <u>Evans</u> and <u>Corcoran</u>, "the plaintiff was the party who was deceived and not the party injured.  The case at bar presents the opposite situation.  The dicta in <u>Evans</u> and <u>Corcoran</u> should not be extended to deny recovery to a plaintiff who was proximately injured by defendants' deception of a third party.  A more logical reading of that language is merely that a plaintiff who has not suffered an injury recognized by the mail fraud statute lacks standing"); <u>see also</u> <u>American Express Co. Shareholder Litig.</u>, 840 F. Supp. 260, 266 (S.D.N.Y. 1993) (rejecting defendant's argument that "plaintiffs' mail and wire fraud allegations [we]re inadequate because the persons deceived by the scheme . . . were not the same persons injured thereby," noting "this Court has twice rejected this proposition"), <u>aff'd</u> 39 F.3d 395 (2d Cir. 1994).

defrauding the wrong party.  An indictment for defrauding the Postal Service would have led to a conviction that would surely have been affirmed."  816 F.2d at 102.  Judge Newman's observation suggests that the Government's depositors-as-victims fraud theory in this case – alleging that misrepresentations made to the Bank caused harm to depositors who received fewer shares than they sought to purchase - is viable, because in Starr the defendants' misrepresentations were made to the customers, who suffered no harm, but in the view of Judge Newman, a conviction on an indictment alleging intent to deprive the Postal Service of money or property (notwithstanding that defendants did not actually deceive the Postal Service), would have been upheld.

In light of the fact that the Second Circuit has not yet passed on the convergence requirement urged by defendants, and given the above, including Judge Newman's dicta in Starr, the Court declines to read such a requirement into the text of the statutes, particularly where the legislative intent behind the statutes "to protect the people from schemes to deprive them of their money or property," see Cleveland, 531 U.S. at 18-19 (citing McNally, 483 U.S. at 356), does not imply such a requirement.

## C.   Requisite Criminal Intent

Defendants' final argument in support of dismissal is that because "[a] conviction for all of the charged offenses requires

24

proof that the defendant acted with the intent and purpose of harming the victim," and given that "'victims' did not exist at the time of the alleged scheme, as a matter of law it is not possible for [defendants] to have formed the requisite intent." Vought Mem. at 13.  "There is no way that [defendants] – or anyone – could have known whether any such 'victims,' would ever exist, much less form an intent to harm such victims."  <u>Id</u>.  The Government responds that "the sufficiency of the government's evidence of the conspirators' fraudulent intent is not considered on a motion to dismiss the indictment," and claims that defendants' argument "misses the point" because, <u>inter</u> <u>alia</u>: (1) the Government may be able to prove that defendants knew or believed that depositors would be prevented from purchasing all of the stock that they were eligible to receive; (2) "the mere fact that property, or a property right, had not yet been transferred to a victim does not mean that the defendants were incapable of devising a scheme to prevent the victim from obtaining it;" and (3) "it cannot possibly be the case a defendant must know the full identity of a victim in order for there to be fraud."  Gov't Opp. at 22-23.

Defendants acknowledge that "the absence of a defendant's criminal intent would not ordinarily be the subject of a motion to dismiss," but contend that "in this case the Government cannot and would never be able to prove that [defendants] intended to

harm any Secondary Depositors or the Bank by [their]
participation in the Bank stock offering" because "prior to the
deadline for submission of stock orders . . . no one . . . knew
how many depositors would order Bank shares, the number of shares
that would be ordered, or the number of shares that would be
issued, which could have ranged from approximately 65.9 million
to 102.5 million, depending on subscriber interest."  Vought
Reply at 27.  "In light of such uncertainty," defendants claim,
"it simply is not possible, and will not ever be possible, for
the Government to establish that [defendants] intended to harm
non-existent victims."  Id. at 27-28.

As the Government notes, "the sufficiency of [its] evidence
of the conspirators' fraudulent intent is not considered on a
motion to dismiss the indictment.  In order to charge a crime, an
indictment need only track the language of the statute alleged to
have been violated and, if necessary, state the time and place of
the offense in approximate terms."  United States v. Martin, 411
F. Supp. 2d 370, 373 (S.D.N.Y. 2006) (citing United States v.
Flaharty, 295 F.3d 182, 198 (2d Cir. 2002)).  "It is well settled
that an indictment is sufficient if it, first, contains the
elements of the offense charged and fairly informs a defendant of
the charge against which he must defend, and, second, enables him
to plead an acquittal or conviction in bar of future prosecutions
for the same offense."  Alfonso, 143 F.3d at 776.

26

Here, the Indictment tracks the relevant statutes and alleges, _inter_ _alia_, that defendants "knowingly, willfully, and with intent to defraud, devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises."  Indictment Counts 2-5 ¶ 2 (mail fraud); Counts 5-6, ¶ 2 (wire fraud); Counts 7-12 ¶ 2 (securities fraud). Ultimately, "the government must show that some actual harm or injury was contemplated by the schemer," _Dinome_, 86 F.3d at 283, and "[i]t is not sufficient that [the] defendant realizes that the scheme is fraudulent and that it has the capacity to cause harm to its victims," _United States v. Bifulco_, 127 Fed. Appx. 548, 550 (2d Cir. 2005).  "The money or property deprivation must be a goal of the plot, not just an inadvertent consequence of it."  _United States v. Regan_, 713 F. Supp. 629, 637 (S.D.N.Y. 1989).

While defendants argue that such proof is impossible as a matter of law, the Court disagrees and will await the trial evidence of whether or to what extent defendants anticipated the harm their scheme might have on depositors who were otherwise eligible to purchase the shares that defendants obtained. Indeed, from the scheme alleged, defendants sought out depositors with large accounts to ensure they would be able to purchase significant amounts of stock even in the event the IPO was

oversubscribed.  Further, it is clear from the face of the
Indictment that the alleged "goal" of the scheme was to obtain
shares of NAB stock to which defendants were not entitled but to
which legitimate depositors were entitled in accordance with a
predetermined allocation system.  See United States v. Trapilo,
130 F.3d 547, 552 (2d Cir. 1997) ("[A]s the statute plainly
states, what is proscribed is use of the telecommunication
systems of the United States in furtherance of a scheme whereby
one intends to defraud another of property.  Nothing more is
required.  The identity and location of the victim, and the
success of the scheme, are irrelevant."). Thus, absent a full
proffer of the Government's evidence, which has not been made and
is not required on a motion to dismiss, the Court cannot
determine whether the Government's evidence will suffice to prove
the requisite fraudulent intent.  At this stage, the Indictment
tracks the statutory language and contains an alleged scheme
which is adequate to survive dismissal.

     **D.   Summary**

     Thus, for the foregoing reasons, defendants' Motions to
Dismiss [Docs. ## 30, 35] will be denied.

## III. MOTIONS FOR BILL OF PARTICULARS [DOCS. ## 34, 37]

     Defendants also move for a bill of particulars on the basis
that they "not only face[] an indictment which alleges facts
never prosecuted before, . . . [the] Indictment is so vague as to

deprive [defendants] of the ability to defend [themselves] adequately and to understand with certainty with which conspiracy [they] ha[ve] been charged." Lucarelli Mem. at 3. Following briefing on defendants' motions the Government provided defendants with some additional discovery materials and thus defendants' motions were narrowed at oral argument to a request for disclosure concerning the Government's theory of fraud, including identification of the claimed victims of the alleged fraud, and a request for the identification of all members of the conspiracy alleged in the Indictment. See Tr. at 67-68, 70.

The Government opposes defendants' requests, arguing that "[p]ursuant to Rule 7(f) of the Federal Rules of Criminal Procedure, a bill of particulars is appropriate only where necessary to inform a defendant of the charge against him with sufficient specificity to enable him to prepare his defense, to avoid or minimize the danger of surprise at trial, and to allow him to plead his acquittal or conviction in bar of future prosecution for the same offense," and that defendants have not met this burden here. Gov't Opp. at 37 (citing cases). The Government contends that defendants' requests overreach the bounds of what may be sought by way of a bill of particulars and claims that "[t]he indictment here is far from a basic cookie-cutter document; rather, in more than twenty-one pages, it provides extensive detail about the charged crime." Id. at 40.

29

The Government also argues that the Government's legal theory has been provided in its briefing and "[t]herefore, the defendants have been fully apprised of the nature of the conspiracy charged, the identity of the alleged victims, and the property that is the subject of the fraud charge, as requested." <u>Id</u>. at 41.

"It has long been settled that an indictment is adequate so long as it contains the elements of the offense, sufficiently apprises the defendant of what he must be prepared to meet, and is detailed enough to assure against double jeopardy." <u>United States v. Salazar</u>, 485 F.2d 1272, 1277 (2d. Cir. 1973). Accordingly, Rule 7(f) "permits a defendant to seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." <u>United States v. Bortnovsky</u>, 820 F.2d 572, 574 (2d Cir. 1987).  Courts have "consistently sustained indictments which track the language of a statute and, in addition, do little more than state time and place in approximate terms," <u>Salazar</u>, 485 F.2d at 1277, and thus "[a] bill of particulars is required 'only when the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused.'" <u>United States v. Ojeikere</u>, 299 F. Supp. 2d 254, 260 (S.D.N.Y. 2004) (quoting

30

United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990)).  "The decision to grant or deny a bill of particulars is within the sound discretion of the district court."  United States v. Davidoff, 845 F.2d 1151, 1154 (2d Cir. 1988).

"Generally, if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required."  Bortnovsky, 820 F.2d at 574.  Additionally, "[i]t is repeated over and over again in the cases that a bill of particulars may not call for an evidentiary matter.  Other cases say the government will not be required to disclose its legal theory on a bill of particulars."  United States v. Ganim, 225 F. Supp. 2d 145, 156 (D. Conn. 2002) (citing Wright & Miller, Fed. Practice & Procedure 3d, § 129 at 659-60); accord Davidoff, 845 F.2d at 1154 ("The prosecution need not particularize all of its evidence."); Ojeikere, 299 F. Supp. 2d at 260 ("The Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crimes charged, or a preview of the Government's evidence or legal theories.").  Further, "[t]he crucial question is whether the information sought is necessary, not whether it is helpful."  United States v. Love, 859 F. Supp. 725, 738 (S.D.N.Y. 1994), aff'd sub. nom. United States v. Roberts, 41 F.3d 1501 (2d Cir. 1994).

31

With respect to the request for identification of all alleged co-conspirators, defendants argue that such information is necessary both for double jeopardy purposes and so that defendants are aware of what hearsay testimony will be admissible as statements by co-conspirator pursuant to Fed. R. Evid. 801(d). However, this is not the sort of information the Government will be required to disclose in light of the Indictment's considerable detail.  See Wong Tai v. United States, 273 U.S. 77, 82 (1927) (affirming denial of bill of particulars "setting forth with particularity the specific facts in reference to several overt acts alleged in the indictment," "which in effect sought a complete discovery of the Government's case in reference to the overt acts"); United States v. Torres, 901 F.2d 205, 233-34 (2d Cir. 1990) (affirming district court's denial of motion for bill of particulars which sought identification of co-conspirators and precise dates and locations that defendant was alleged to have engaged in overt acts in furtherance of the conspiracy); Ojeikere, 299 F. Supp. 2d at 260-61 (denying motion for bill of particulars disclosing, inter alia, the identities of unnamed co-conspirators, where the initial criminal complaint, superseding indictment, and discovery materials adequately explained the specific acts of which defendant was accused in sufficient detail to eliminate possibility of surprise and allow defendant to interpose a double jeopardy plea, noting "demands for particular

32

information with respect to where, when and with whom the Government will charge the defendant with conspiring are routinely denied"); United States v. Reinhold, 994 F. Supp. 194, 201 (S.D.N.Y. 1998) (denying motion for bill of particulars seeking identification of unnamed alleged co-conspirators where the indictment was detailed in its allegations and defendants had extensive discovery, concluding that "there is no danger that, absent a bill of particulars, the defendants will be unfairly surprised at trial," and noting "[s]o long as the defendant [is] adequately informed of the charges against him and [is] not unfairly surprised at trial as a consequence of the denial of the bill of particulars, the trial court has not abused its discretion").  Further, as to the hearsay issue, the Government acknowledged at oral argument that hearsay will not be admissible for those witnesses not identified as "co-conspirators" sufficiently before trial.  See Tr. at 84.

As to the request concerning the Government's theory of the case, a bill of particulars is not properly directed to disclosure of the prosecution's legal theory such as, in this case, the Government's fraud theory, including the claimed victims of the alleged fraud.  Further, the information sought has been provided either in the indictment or by the Government's discovery and the Government's fraud theories have now been previewed in briefing on defendants' motions.  The Government

represented it "do[es] not have any intention of adding to the victims other than the[] two discrete groups of victims with the separate theories associated with them that [were briefed and argued]," Tr. at 71, and will be held to its representation.

Thus, defendants have failed to demonstrate the necessity of a bill of particulars either to assist them in preparation of their defense or to eliminate any surprise at trial, particularly given the extensive briefing of the Government's legal theories in the case, nor have they shown prejudice for double jeopardy purposes.  Defendants' Motions for a Bill of Particulars will therefore be denied.

## V.   MOTION TO EXCLUDE RULE 404(B) EVIDENCE [DOC. # 33]

Defendant Vought also seeks to exclude any Fed. R. Evid. 404(b) evidence on the basis that the Government has failed to provide proper notice of such evidence as required by the District of Connecticut's Standing Order on Discovery, and because such evidence is prejudicial and should be excluded under Fed. R. Evid. 403 in any event.  Vought also argues that "where the Government itself has raised the possibility of offering this evidence in its case-in-chief, early review of this proposed evidence is warranted, and the Court should direct the Government to disclose the purpose for which it believes the evidence would be relevant and to detail for the Court and counsel its theory of relevance so that the issue can be resolved well before trial."

Vought Reply at 35.

The Government responds that its disclosure "explicitly itemizes (1) the identity of the prior transaction that may be introduced; (2) the persons involved in the transaction; and (3) the amount of funds involved in the transaction," and contends that this satisfies the requirements of Rule 404(b) in "appris[ing] the defense of the general nature of the evidence of extrinsic acts." Gov't Opp. at 29 (citing Fed. R. Evid. 404(b), Advisory Comm. Notes). The Government also claims that the more general language in its disclosure ("any other such evidence...") constituted a reservation of its rights ("the United States reserves the right to introduce any other such evidence..."), and is not intended as a "limitless designation." Id. at 30-31.[7]

> Under Rule 404(b),
>
> Evidence of other crimes, wrongs, or acts . . . may . . . be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

This District's Standing Order on Discovery provides that the Government shall disclose to defendant, within 10 days of

---

[7] The Government advises that it anticipates moving in limine to seek the Court's guidance on its 404(b) evidence, at which time the Rule 403 issues identified by defendants can be fully developed.

arraignment "[a]ll information relating to other crimes, wrongs
or acts by the defendant that will be offered as evidence by the
government at trial pursuant to Federal Rule of Evidence 404(b)."
Conn. Local. Crim. Rule Appx., Standing Order on Discovery
(A)(13).  The Advisory Committee Notes to Rule 404(b) state that
"no specific form of notice is required.  The Committee
considered and rejected a requirement that the notice satisfy the
particularity requirements normally required of language used in
a charging instrument. . . . Instead, the Committee opted for a
generalized notice provision which requires the prosecution to
apprise the defense of the general nature of the evidence of
extrinsic acts."

Here, the Government provided defense counsel with the
following timely disclosure:

> [T]he government may seek to introduce evidence in its
> case-in-chief that your client financed a similar
> transaction with members of Ms. Diaz's [Vought's
> assistant's] family in connection with the conversion
> of Independence Savings Bank to stock form and advanced
> approximately $1 million to Ms. Diaz to effect a
> purchase of stock by her family members.  This evidence
> may be introduced for all legitimate purposes including
> to show intent, preparation, knowledge, opportunity,
> plan, and absence of mistake.

See Gov't Opp. at 29.  The Government also stated:

> Moreover, the United States reserves the right to
> introduce any other such evidence pursuant to Rule
> 404(b) for all legitimate purposes including to show
> intent, preparation, knowledge, opportunity, plan, and
> absence of mistake.  At this stage of pretrial
> proceedings, the United States cannot determine whether
> other crimes or bad acts evidence including that set

36

forth above will be part of its case-in-chief since the
United States has no idea what the defendant's claims
at trial will be.  Whether the United States does
introduce other crimes or bad act evidence depends in
large part on how the actual trial proceeds and whether
knowledge, intent, plan, or identity is a disputed
issue. . . .  Nevertheless we are providing you with
this information so that you may consider it as
evidence that the Government may seek to introduce
pursuant to Rule 404(b).

Id. at 30-31.

The Government's disclosure of the Diaz evidence easily
meets the "generalized notice" requirement of Rule 404(b), as the
Government both described the potential evidence and identified
the purposes for which it would be offered, which purposes were
clarified at oral argument (see Tr. at 110-11).  See, e.g.,
United States v. Richardson, 837 F. Supp. 570, 575-76 (S.D.N.Y.
1993) (refusing to require the government to provide "more than
notice of the 'general nature' of the extrinsic acts evidence it
will seek to admit because that is all that is required by the
specific language of Rule 404(b) and it is sufficient to allow
the defendant to adequately prepare for trial").  The
Government's broad reservation of rights to introduce other Rule
404(b) evidence for "all legitimate purposes" cannot contravene
this District's requirement that any such evidence, along with
the purpose for which it would be offered, must have been
disclosed within 10 days of Vought's arraignment.  Thus, as the
Government acknowledged at oral argument, unless the Government
hereafter seeks admission of additional 404(b) evidence which it

37

recently discovered, or provides other good cause for the failure to give earlier notice, other 404(b) evidence will be excluded. See Tr. at 104-08.  Moreover, the Government will be required to proffer any additional 404(b) evidence to the Court for ruling on admissibility before it is offered at trial.[8]

Thus, as outlined above, defendant Vought's motion to exclude [Doc. # 33] will be granted in part and denied in part.

## VI.   MOTION FOR A SUBPOENA [DOC. # 38]

Defendant Lucarelli also moves for the issuance of a subpoena to be served on NAB calling for the production of NHSB records relating to whether, at the time of the IPO, NHSB "was well aware that depositors seeking to purchase shares in the IPO were doing so pursuant to agreements with others to finance those

---

[8] See Fed. R. Evid. 404(b), Advisory Comm. Notes ("Nothing in the amendment precludes the court from requiring the government to provide it with an opportunity to rule in limine on 404(b) evidence before it is offered or even mentioned during trial. When ruling in limine, the court may require the government to disclose to it the specifics of such evidence which the court must consider in determining admissibility."); see also United States v. Figueroa, 618 F.2d 934, 938-39 (2d Cir. 1980) ("If the evidence is offered to prove that the defendant committed the act charged in the indictment, for example, by proving identity or common scheme, the evidence may be offered during the prosecution's case-in-chief, unless the defendant's commission of the act is not a disputed issue.  On the other hand, if the evidence is offered to prove the defendant's knowledge or intent, the offer of similar acts evidence should await the conclusion of the defendant's case and should be aimed at a specifically identified issue.  This enables the trial judge to determine whether the issue sought to be proved by the evidence is really in dispute and, if so, to assess the probative worth of the evidence on this issue against its prejudicial effect.").

purchases and transfer the shares to those others after they were acquired."  Lucarelli Mem. at 16.  Lucarelli contends that "[i]f in fact the NHSB was aware of such agreements, it is unlikely that it was deceived in any manner and, therefore, it is unlikely that the fraud charged in the indictment occurred." Specifically, Lucarelli claims that "assuming, [arguendo,] that the Government proves that Mr. Lucarelli was aware of the alleged inaccuracies in the stock order forms, Mr. Lucarelli will seek acquittal based upon the Government's inability to prove that he believed the NHSB was unaware of the inaccuracies in the forms. If Mr. Lucarelli believed the NHSB was aware of these alleged inaccuracies, he lacked criminal intent to deceive or harm anyone."  Lucarelli Reply at 6.  Lastly, Lucarelli contends that the Government "should be ordered to furnish [him] under it[s] Brady obligations with all material or information in its possession proving or tending to prove that the NHSB was aware of the inaccuracies in stock order forms, or consciously avoided this knowledge, or that the depositors, or [the Government's witnesses] believed, or relied upon the fact, that the NHSB was aware of the inaccuracies in the forms, and therefore did not have criminal intent."  Id. at 9.

After oral argument, at the Court's request, Lucarelli submitted a revised and narrowed proposed subpoena, seeking:

> 1.   Any and all writings, tapes, computer files and
>       disks in your possession, or under your control,

39

including, but not limited to, documents of any
kind, correspondence, e-mail communications, tape
recordings, notes, and written analyses and
reports, reflecting, relating and referring to the
knowledge and/or speculation and/or awareness of
employees and/or representatives of the New Haven
Savings Bank ("NHSB") and/or its successor,
Newalliance Bancshares, Inc., and/or its
underwriter, Ryan Beck, of the fact that
depositors of the NHSB who were applying to
purchase shares in the IPO, and/or who had
purchased shares in the IPO had entered into
agreements with others to (1) assist in the
financing of the purchase of those shares and/or
(2) to transfer shares acquired in connection with
the IPO to others for any reason.

2.     Any and all writings, tapes, computer files and
disks in your possession, or under your control,
including, but not limited to, documents of any
kind, e-mail communications, tape recordings,
notes, and written analyses and reports,
reflecting evidence of any and all agreements
between any depositor of the NHSB and another, in
advance of the submission of such depositor's
stock order form seeking to acquiring [sic] shares
in the IPO, to transfer those shares to another
after they were acquired, or to transfer
proceedings from the sale of such shares to
another.

The Government objects to this request, arguing that Rule

17(c) was not intended as a broad discovery device, and that

Lucarelli must demonstrate the relevance of the requested

documents before issuance of a subpoena.  The Government claims

that the requested documents are not relevant because "[t]here is

no question in the current case that, if the stock purchasers had

not represented that they were purchasing the shares with their

own money, and that they had not agreed to transfer the shares,

the stock would not have been transferred to them," and as a

result there can be no doubt that the misrepresentations were "material." Gov't Opp. at 34-35 (citing <u>Thomas</u>, 377 F.3d at 240-44 for the proposition that "evidence regarding the victim's lack of caution when dealing with the scheme has absolutely no bearing on the issue of guilt, and may properly be excluded from trial").

Fed. R. Crim. P. 17(c) provides that "[a] subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates.  The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence."  The Supreme Court has cautioned that "[i]t was not intended by Rule 16 to give a limited right of discovery, and then by Rule 17 to give a right of discovery in the broadest terms. . . . Rule 17(c) was not intended to provide an additional means of discovery."  <u>Bowman Dairy Co. v. United States</u>, 341 U.S. 214, 220 (1951); <u>accord United States v. Murray</u>, 297 F.2d 812, 821 (2d Cir. 1962) ("[Rule 17's] purpose is rather that of the traditional subpoena duces tecum, to permit a party to obtain books, papers, documents or other objects for use by him as evidence.").  Thus, "[t]he party seeking production has the burden of showing that production would not be 'unreasonable or oppressive'" by establishing:

> (1) that the documents are evidentiary and relevant;
> (2) that they are not otherwise procurable reasonably
> in advance of trial by exercise of due diligence; (3)
> that the party cannot properly prepare for trial
> without such production and inspection in advance of
> trial and that the failure to obtain such inspection

41

may tend unreasonably to delay the trial; and (4) that
the application is made in good faith and is not
intended as a general "fishing expedition."

In re. Irving, 600 F.2d 1027, 1034 (2d Cir. 1979) (citing United
States v. Nixon, 418 U.S. 683, 699-700 (1974)).

Lucarelli's argument that the documents he seeks would be
relevant to his defense of absence of fraudulent intent is
unpersuasive because even if the Bank knew misrepresentations
were being made by depositors, such evidence does not disprove
defendants' intent to defraud.  Cf. Thomas, 377 F.3d at 242
("[T]he Eleventh Circuit recently rejected the exact argument
[defendant] is advancing here – that the mail fraud statute does
not reach material, false representations if a reasonable person
would not have acted upon them. . . . We therefore reject
Thomas's argument that the foolishness of Pastor Holmes's belief
in Thomas's fraudulent scheme somehow vitiates Thomas's
fraudulent intent.  We refuse to accept the notion that the
legality of a defendant's conduct would depend on his fortuitous
choice of a gullible victim.") (internal quotation omitted).

However, as the Government acknowledged at oral argument, a
subpoena narrowly tailored to obtain information concerning the
Bank's awareness that some of its stock purchasers were being
financed by non-depositors would be relevant to the issue of

whether the Bank was deceived.  <u>See</u> Tr. at 92.[9]  And, as the
Government agreed, if the Bank was not deceived, the Government's
fraud theory fails.  <u>Id</u>. at 103 ("THE COURT: So, if the bank
wasn't deceived, the rest of the case folds?  MR. RING: I guess
if the entire bank and everybody in it wasn't deceived . . . I
think that's right . . .").

Thus, for the reasons set out above, the Court grants the
motion for a subpoena on the narrower grounds as follows:

1.   Any and all writings, tapes, computer files and
     disks in your possession, or under your control,
     including, but not limited to, documents of any
     kind, correspondence, e-mail communications, tape
     recordings, notes, and written analyses and
     reports, reflecting, relating and referring to the
     knowledge or awareness of employees and/or
     representatives of the New Haven Savings Bank
     ("NHSB") and/or its successor, Newalliance
     Bancshares, Inc., and/or its underwriter, Ryan
     Beck, of the fact that depositors of the NHSB who
     were applying to purchase shares in the IPO had
     entered into agreements with others regarding the
     sale or transfer of those shares or the right to
     subscribe for those shares.

2.   Any and all writings, tapes, computer files and
     disks in your possession, or under your control,
     including, but not limited to, documents of any
     kind, e-mail communications, tape recordings,
     notes, and written analyses and reports,
     reflecting any and all agreements between any
     depositor of the NHSB and another, in advance of
     the submission of such depositor's stock order
     form, related to acquiring shares in the IPO,
     transfer of those shares to another after they

---

[9] Lucarelli's <u>in camera</u> submission appears to demonstrate a
good faith basis for believing such materials may exist, such
that the issuance of a narrowly tailored subpoena would not
constitute a fishing expedition.

were acquired by the depositor, or transfer of the proceeds from the sale of such shares to another.

## VII. CONCLUSION

For the foregoing reasons, defendants' Motions to Dismiss [Docs. ## 30, 35] are DENIED, defendants' Motions for Bill of Particulars [Docs. ## 34, 37] are DENIED, defendant Vought's Motion to Exclude Rule 404(b) Evidence [Doc. # 33] is GRANTED in part and DENIED in part, and defendant Lucarelli's Motion for Issuance of a Subpoena [Doc. # 38] is GRANTED, as described above.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton
United States District Judge

**Dated at New Haven, Connecticut this 15th day of June, 2006.**